Our third case for this morning is Design Basics v. Lexington Homes. We'll hear first from Mr. Hopkins. Good morning, Police and Court. I'm Michael Hopkins. I represent Design Basics in this appeal. The overriding error, before I get into the specifics, that the trial court engaged in was that it did not apply the standard summary judgment protocol. The facts here were not viewed in favor of Design Basics, nor were the reasonable inferences from the evidence drawn in favor of Design Basics. What actual evidence was there that all four of the designs that you're alleging were the subject of copyright infringement had been uploaded to the Design Basics website at a time when Lexington might have seen them? The record as presented is somewhat scarce in that issue. Well, that's a problem for me, actually. Well, there's other evidence where an inference can be drawn as to the date. We do know from the registration certificates when these works were created and registered. And when was that for the four of them? I'd have to look at the registration certificates themselves. But it was well before the infringing activity here. It was in the 90s. So your allegation is the infringing activity doesn't begin until when, about 2008 or so? Correct. We actually went back and looked at about 10 years' worth of plans from Lexington Homes from the date. So, yeah, probably about earlier, probably the early 2000s. But you're asking us to infer that because they were registered with the Copyright Office, they were also uploaded to the website without any further evidence of what was available? Well, there is evidence in the form of a declaration that all of the plans were on the website. And I think the reasonable inference here is why would a design company like Design Basics go through the trouble of creating a new plan, having it registered, and then why would they stick it in a folder for two years or three years or six months or two days? Don't you all have control of that information? Yes, sir, we do. And there's silence? Well, it wasn't put in the record here as to the date they were actually uploaded. Like I said, I think the reasonable inference is you create the plan and you upload it. We would have had an incentive to do so. We usually don't say the fact that somebody has an incentive to do something in their own interest is evidence that they've actually done it. Correct. Particularly because I gather the current owners of Design Basics purchased the company only fairly, well, maybe May 2009 is not recent anymore, but long after these designs were supposedly created and registered. That's correct. So all the more reason to examine what one's predecessors might have done, even if you would have uploaded it right away. Well, as I said, the record is sparse. You're absolutely correct. But that's a big issue, of course. Obviously access is critical before there can be copying because that's one of the differences between copyright and patents. In copyright, if you create the identical thing, you haven't infringed if you did it independently, whereas in patent, the identical thing does infringe. Absolutely. But if you look at Judge Griesbach's decision, what he held was there was no evidence that they had these four plans in their possession, but there was no dispute that all the plans were uploaded to the website. There was no dispute that these defendants knew who Design Basics was, and there was no dispute that they had other plans. But the uploading date was unclear. Actually, what the judge says is, despite the foregoing evidence suggesting they had access to the plaintiffs' works in general, there's no evidence that they had access to the four works at issue in this case. And he notes that these five plan books don't have it. There are a couple of other things. And he's also not satisfied with the quality of the Internet. I mean, I don't think you have any evidence, by the way, myself, other than the Internet evidence. And so if that falls apart, I don't know how you can show access. I mean, there are declarations from Mr. Cuso and I believe Mr. Dodge which indicate that they were all on the Internet. When? I don't have that. That's the problem. That's the problem. All right. So let's assume you can solve that one, okay? Let me ask you about my more basic problem with the case. And, in essence, it is in this field of designing single-family homes and middle range of expenses, what counts as so similar that a jury could infer copying? And what effort did you all make to identify what is actually original and protected in your copyrighted works? I'll answer the last part of that question first. If you look at Mr. Cuso's declaration, he talked about what he considered, as a lead designer, unique and protectable in these designs. So what's the answer? For example, yeah. I see a list of factors and a conclusion. I look at these and they're the same. They're similar. Well, no. He talks about the selection and layout of the rooms. But the problem, I'll just amplify what Judge Hamilton is saying because I had the same thought. If you're going to build a four-bedroom single-family home, you're probably going to have four bedrooms upstairs in a hall and you're going to have certain rooms downstairs. And I don't know how this becomes creative enough and different enough to be copyrightable. Common elements would not be. That's true. What the court has to do is look at the definition of architectural work in the Copyright Act because that gives you the information on the manner and scope of protection afforded architectural works. And what it says is the work includes the overall form, as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.  There are a lot of differences between defendants' designs and yours. And there are an awful lot of constraints on architects doing this kind of design work by customer demand, by conventions, practical, stylistic conventions. I don't know if you're familiar with the Second Circuit's decision called Zalewski, 754 F3rd 95, a 2014 decision, that really explores this in some detail, this problem of residential architecture, where the court wound up writing that, yes, it's protectable under the statute, but you've got to be specific about what is protected, and it is a, quote, very thin copyright. And I don't see anything in Mr. Quozzo's affidavit that really lets us see what's protected. Is it just an impression? No, it's what he described. It's the selection of the room. So do we put in four bedrooms or three bedrooms or two? Where do we put those in relation to the other elements in the house? Do we have a great room or don't we have a great room? Do we have a kitchen or not? Where is that in relation to everything else? You've got 2,700 designs, right? Over 2,000 designs, absolutely. Okay, now I haven't tried to do this in a theoretical sense, but if you've got 2,700 designs for single-family houses and if posting them on the Internet is enough to support an inference of access, I can't imagine a case in which in these sort of loosey-goosey, look-and-feel, similar positions of Mr. Quozzo. I don't see how you can't sue everybody in the country and why everybody else in the country can't sue you for your designs. But that's not the situation we have here. Okay, tell me. We also have a situation where these defendants knew of design basics. They had their plans. All right, but let's focus on the similarity issue here. Okay. And please address the problem I'm talking about, about how much is protectable. Well, what is protectable is what is described in the statute. But you need to be more specific about houses. Is it that the doors are 9 feet tall instead of 8? Is it that there's a finial on the staircase banister? Absolutely not. Those individual features in and of themselves are not protectable. So I can't go in and ---- So what's so unique about a ---- You need to find something about the house that's not just driven by its function. Well, yeah, but the ---- Like you're going to have a bathroom probably off the master bedroom. That's pretty standard. The Copyright Act does not require that something be unique or that there be some type of intricate design. But some creativity. It also can't just be functional. Absolutely, absolutely. So the house would be functional if, let me give you an example, say four bedrooms and two and a half baths and we put one floor and we put all four bedrooms on one side or we split the bedrooms up and put them in each corner. We still have all the same function. You still have four bedrooms. You still have the same number of bathrooms. But how you arrange those elements in the design is what is unique and what is protectable. Now that's not to say that another designer can't come in and come up with his own design independently created, and it happens all the time, that is substantially similar to mine. That's okay. If there's independent creation, they're entitled to copyright protection on that design. That doesn't lessen my copyright protection. How many single-family homes are there in the United States, you think? How many? I have no clue. Millions, tens of millions. Fifty million? Sure. At least, right? There's an awful lot of material to work with that's out there, right? Sure. This looks to me like a test case to see how thin a case can we put on and get to a jury and insist on a settlement since litigation income seems to be the primary business model. I would take issue with that. This company is in business to design and develop house plans and licensing. Mr. Carmichael said litigation testified it's a primary source of revenue, right, and that he was attracted to the investment because of the litigation potential. That was in his deposition. It could have been, but the fact is it was. It was in his deposition. Are these designs on Design Basics' website behind a paywall, or do you just see them with a little copyright designator? There are floor plans and elevation renderings that are available on the website. For free? For free, for viewing. For viewing. If you want a construction drawing, that's what you license, and they'll send you the construction drawing with whatever modifications you want. Okay. So does the record show what kind of revenue Design Basics gets from sales of those construction drawings? I'm not sure what is in the record. I can tell you that last year they developed 60 new plans that were registered. So they are registering new copyrights as time is going on. Absolutely, and they licensed over, I believe, 600 plans last year. I don't have a reference to the record, and I'm not entirely sure it's in there, but that is my understanding. Well, the copyright registrations would, I suppose, be a matter of public record. Sure, absolutely. As I said, you don't have to have a unique design to have copyright protection, and if someone else comes up with something that's substantially similar that they can establish was independently created or was created from a common third source, something that was already in the public domain, there is no infringement. The facts in this case, according to Lexington, is that they independently created each of their designs in-house. So they didn't say that there was a common third party. They said it was in-house. And they also say largely the functionality point. If you're building a single-family home between about 1,200 and 1,800 square feet, there's just so much variation you're going to have. People want certain features, right? Well, but within there, you can have one bedroom or four bedrooms, a great room and a den or not. I mean, there are a whole lot of variation. Some variations. If you'd like to save a little rebuttal, that's fine. Thank you. Mr. Kowalkowski. Good morning, Your Honors. If it may please the Court. There is no genuine dispute as to any material fact regarding access in this case. The evidence is crystal clear, despite allegations in Design Basics' complaint that they themselves directly gave plans to Lexington, that it never happened. They checked their marketing materials, their sales history, anything they could look at and said, you're right, we have no proof we gave anything directly to Lexington. So this is the issue about the actual physical plan catalogs and flyers and so forth? Yes, and that is the issue of in a way that Lexington might have been an actual access or even an opportunity. Did the Brown County people or? They jumped from, okay, you got us, we didn't directly give to Lexington, through indirectly, through Brown County Home Builders or Hoyda Lumber, you might have got them through there. But that was all disproven. Some of the plans didn't even exist, three out of four, when, for example, the Home Builders last got anything from Design Basics. As to the fourth plan, at best, they potentially showed the Home Builders Association got it a full decade before Lexington joined that association, and a full 21 years before Lexington built the allegedly infringing home. Moreover, it's uncontroverted testimony by the executive director of that association, who just by coincidence happened to be there in 1994 and today, the whole period. That's lucky. Yeah, that's job security, and said, if we get unsolicited plans, we don't keep them, we throw them away, we don't put them on a shelf for potential members to browse through. They're not here, even if we might have gotten them 20 years ago. That's uncontroverted, on top of, of course, Lexington's own personnel. Well, that's why I said I think this gets down to the website, one way or the other. I didn't see anything aside from the website. And I would agree, Your Honor. And what is most important, or at least one of the important things as to that, in this particular case, Mr. Cuso, the person they offered to say there's some level of evidence these were on the website, was deposed in December of 2015. He was asked point blank, when were these plans put on the site? His answer, I don't know. He was asked more generally, what would it have been shortly after they were created? I don't know. He was asked, well, what's the procedure of Design Basics to put new plans on their website? Answer, I don't know. Well, all they have is later, in an attempt to protect themselves from Lexington's motion for summary judgment on that issue, is the same Mr. Cuso stating generally, we put all our plans on the website. So there's no real proof these plans were on the website prior to the date Lexington independently created its own three plans, or four plans. So the other issue relative to the internet as the sole source here, it is uncontroverted, and admittedly somewhat self-serving, but it's uncontroverted that all the Lexington personnel said they never accessed the website. They didn't even know of Design Basics' website. There might be some proof because of one of these plan books that they saw that had Design Basics referenced in there among dozens and dozens of other designers they might have known of the firm But I thought that there was evidence that indicated that they had heard of Design Basics. Of the entity. Of the company or whatever it is. In discovery, Lexington searched its office in response to a discovery request for any plan books of any nature. They happened to find four on a back shelf that they testified we didn't even know we had them until we started looking. This is the one with the dog-eared page? Exactly. So these are very dated plan books, not even Design Basics plan books. They're from other marketing companies with hundreds of plans and a few of which happen to be Design Basics. So conceivably, Lexington could have, someone could have, found those old books, paged through them, found a specific Design Basics name on one. But they don't have a website. In fact, the whole model of those books is you don't call or contact the designer. They're set up to call the marketing company who puts out the book. That's how they make their money. So no evidence of the website. There could have been evidence of the company's existence itself. Mr. Kolakowski, maybe you can help explain something to me that was a mystery. In Mr. Cuozzo's affidavit, in paragraph 13 he says, through inspection of CAD drawings and blueprints produced by defendants during discovery, plaintiffs found that on every document plaintiff's CMI, I think copyright management information, had been removed and replaced with defendant's false designation in the title block. Is there anything to that? No, I don't. I mean, it sounds terrible, right? That is, here's the drawing. We just take out the little block here and put our stuff in. That would sound pretty bad. Well, first of all, that whole statement's based on a completely false premise, that those were Design Basics plans. They weren't. What they found on the website were Lexington's independently created plans that had Lexington's name on it. So it's a red herring right from the start, where there's no proof of the true exact Design Basic plan simply having their copyright protection mark somehow erased. These were Lexington plans that Lexington created on Lexington's website. I feel like these plans must be very cheap to buy. If there are thousands of them and there's so little room for variation for at least single-family homes of a particular square footage, maybe I'm wrong. I believe there are, Your Honor. I don't know if this is in the record, but just from my searching, I believe they get into the several hundreds of dollars to maybe a more complex plan, creeps over $1,000 roughly to purchase the license to build that particular model. I can imagine. If you want a Frank Lloyd Wright-style house, you might pay an architect a fair amount of money to design something architecturally interesting, but this doesn't seem to be that market. I agree. If I may, one more thing on the website is not only is there no proof these plans were on the website at the times relevant to this case and no proof Lexington accessed it. It's mere speculation they accessed it. In my view, under Seventh Circuit precedent itself, you always need something more than mere speculation. Even if these plans were on the site. This worries me about the future, I have to say, because your position seems to be that the company would need to really dig down and find the IP addresses of everybody who visited the website and sorted and go through a very expensive process to see which computers were there to prove actual access. In today's world, if something's going to come up on the first page of a Google search or some people like other search engines, but a search, it's a very easy inference that they had easy access. Well, my distinction is easy access doesn't equal access. Just because maybe in today's technology it's a little easier to sit on your laptop at home and pull up a plan than jump in your car and drive to a store or something. There's still something in common with both of those ways of getting access. The defendant has to do something more. It's not just it's out there somewhere. It's out there easy to find. It's out there hardware to find. Our proposition is there needs to be something more, some bit of evidence. It may be not directly this defendant. Why not just you've heard of the company. It comes up readily on an ordinary search. Almost a burden shift, show us that you didn't have access because it just seems to me in today's world access is a very, as you just described, a very different proposition. If you're the kind of person who likes to sit around your computer at 11 at night and do your cyber shopping, you're a lot different from the person who goes to the mall. It's way easier. Two responses. One is that would be a dramatic shift in the law to simply say, if you're the defendant, you have to prove an absence of access. That would be a virtual impossibility to prove that negative. But the law is changing in a lot of areas, whether personal jurisdiction or whether infringement of copyrights, other areas as well, to try to accommodate the Internet, which is a bad fit with a lot of old legal doctrines. Well, and I think there is a way that today's technology and the historic law relating to access and copyright can merge. And one of those ways, ironically, was suggested in Design Basics' own reply brief. They said if you're going to look at Internet as an access, other things a court should consider in that context is site hits, search engine result rankings, the usability of the website for browsing or searching for the protected work at issue. See, there's something more that it's not just it's out there, that it's a prominent site. It has so many, even if it's not this particular defendant, and, you know, it had a million hits last month, or this plan was clicked on 50 times by at least somebody on the planet, or this is such an, you know, you hit a Google search, which I did, and it doesn't pop up on the first page or the first item. Not even close. So you need something beyond simply it's on our Internet site, end of story, because that would make the defendant's job virtually impossible to defend these cases, especially here when you're talking something as thin as trying to copyright a generic standard starter home. A defendant would have to throw in the towel right from the start. On this question of access, I guess I've been thinking about a couple of older technologies, books and songs. I mean, I suppose if it's Born to Run or Johnny B. Good, you probably don't have to show access, right? Everybody in this culture has probably heard those songs and has them in their heads. On the other hand, the fact that a book is published and in a public library, available in public libraries across the country, I don't think is enough to show access. I don't believe it is either. I mean, perhaps if there was more, it's in a public library in your city for which you have a library card. Now you're inching closer to the opportunity to access. But, again, my point is the mere proof it's somewhere is not enough. There always has to be at least some possibility that this defendant or at least the public at large is going to it, somehow stumbling across it. Is there any issue of attorney's fees in this case? There is, Your Honor. The district court awarded attorney fees in this case as to the issue, and we're in the middle of briefing as to the amount. The one last thing I would indicate, especially with this access issue, if I may, is to the extent you're kind of getting away with actual proof of access and striking similarity, which has been brought up in the briefs, that's typically in the context of something that's unique or complex. Nimmer on copyright, citing Sell from this circuit, said that whole striking similarity is just an ill fit for something that is short and builds on a repeated pattern. In that case, Sell, it was a song. But in this case, basic starter homes, which only so many rooms you may shift around, they're small, basic, built on a repeated pattern. So striking similarity as a replacement for access just does not fit well with this type of case relating to architectural works, potentially in others. You just have to, I don't know, the test, I'm not sure it's a bad test, but it has to be adapted to the nature of the material and what's protected. Exactly. And that's because these copyrights are so thin as compared to, say, Frank Gehry's museum designs, which you could tinker a little bit with that and still be infringing it. Right. Well, and again, I think Your Honor mentioned earlier there was a question about, well, what's truly unique or original or creative about design basics plans? And I agree, Mr. Cuso doesn't say so. He says here are the nine criteria he believes are important. He doesn't really say why. And then he says, and I looked at the plans, and they're substantially similar when looking at those criteria. Even if he happened to get one or more of those criteria right, in that that item is protectable in an architectural setting, he didn't say what was unique about design basics placement of rooms or overall flow, which then again gets to the point of, where's there any similarity that they pointed out, let alone striking similarity? I think the district court judge got it absolutely right when he noted these are basic starter homes and there's only so many ways, as several cases have cited, you can move them around. Unless there's any other questions, that's all I have. All right. Thank you very much then. Mr. Hopkins, I think you have about a minute. Thank you. Very briefly. It's never been the law in this circuit, and it's only been established in a couple of others, that the copyright protection afforded architectural works is thin. This is a situation. But it depends. No, that's right. It's not a general rule. Compare Frank Gehry or Frank Lloyd Wright to these designs. True. But I think the better analysis is there's no requirement under the law that it be unique or novel or that it be intricate. So if you've got a simple design, whether it's a house plan or something else, I think the fact that it's simple would make it easier to prove independent creation or that they copied it from a common third source. And those are jury questions that have to go in front of the jury. Once access is established and substantial similarity using the ordinary observer test goes to the jury. So counsel can get up and say, look, these are simple designs. This isn't rocket science. Anybody can do it. There are only so many ways. And the plaintiff can get up and say, listen, they knew about these plans. They knew about our plans. Look at these things. There are four of them. This is more than coincidental that all four of these are spot-on copies. Okay? Those are jury questions. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.